## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number CR-05-106-C |
| | ) | |
| OROD G. KALKHORANI and | ) | |
| TOUSSAINT O. BOOKER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Now before the Court are two Motions to Suppress, the first filed by Defendant Orod

G. Kalkhorani (Kalkhorani) and the second by Defendant Toussaint O. Booker (Booker).

Plaintiff United States of America (Plaintiff) filed a combined response to both motions.  On

August 16, 2005, the Court conducted a hearing on the Motions to Suppress.*  The Court,

upon full consideration of the litigants' briefs and the evidence submitted at the hearing, now

**DENIES** both Motions to Suppress.

## BACKGROUND

During the morning of May 3, 2005, Oklahoma Highway Patrol Trooper Garrett

Vowell (Trooper Vowell) was parked in his scout car near the toll booth adjacent to I-44 near

Stroud.  He observed a white car exit the highway, without the use of a turn signal, to

approach the toll booth .  Trooper Vowell instigated a traffic stop and motioned for the

driver, Kalkhorani, to step out and to the rear of the car.  The car's other two passengers, one

---

* Booker waived his right to appear at the hearing.  Booker's attorney, however, did cross-examine Plaintiff's witness.

in the front seat and another in the rear seat, remained in the vehicle.  Trooper Vowell requested Kalkhorani's driver license; however, Kalkhorani stated he did not have his driver license as his wallet had been recently stolen.  Instead, Kalkhorani turned over his green card. Trooper Vowell then requested Kalkhorani to step back to the patrol vehicle.

Inside the patrol vehicle, Trooper Vowell informed Kalkhorani that he would receive only a warning citation.  Trooper Vowell asked Kalkhorani who owned the car, the group's travel history and travel plans, and requested the vehicle's insurance and registration. Kalkhornai responded that the vehicle belonged to his friend Mark, the individual in the back seat, and that Mark would probably have the requested insurance information.  However, when asked by Trooper Vowell, Kalkhorani could not provide Mark's last name.  Kalkhorani further stated that they were coming from St. Louis, Missouri, that they had been on the road for two days, and that they had been looking at property.  He also stated that they were headed to Arlington, Texas.  During this time, Trooper Vowell noticed that Kalkhorani would not make eye contact, his bottom lip and his hands were shaking, and that he was rubbing his hands across his pants.

Trooper Vowell exited his patrol vehicle and returned to the car in order to retrieve the insurance documents.  While at the car Trooper Vowell spoke with Booker, the front seat passenger, and made the same inquiries previously listed.  Booker stated that he had a valid driver license, that the car belonged to his wife, and that they were going to Arlington, Texas, to visit a cousin.  Booker further stated that they were coming from Indiana and Tennessee, that they had been sightseeing along the way, and that they had been traveling for one week.

Trooper Vowell also briefly questioned the rear-seat passenger, Mark Thompson (Thompson), by requesting his driver license.  Thompson was unable to produce a driver license.  During this encounter, Trooper Vowell noticed that Booker was hesitant in handing over his driver license, was opening and shutting his wallet several times, and that his hands were shaking when he handed over his license and insurance documents.

Upon Trooper Vowell's return to his patrol vehicle, he contacted dispatch and requested dispatch to run checks on Kalkhorani, Booker, and Thompson, as well as a registration check on the car.  Trooper Vowell spoke with Kalkhorani again and attempted to verify the car's ownership.  Kalkhorani responded this time that he did not know to whom the car belonged and also attempted to clarify the group's travel history.  Trooper Vowell subsequently contacted dispatch again and requested "Triple I" checks on all three individuals.  Due to a communication error, information regarding the third passenger had to be transmitted a second time to dispatch.

Trooper Vowell completed the warning citation and obtained Kalkhorani's signature on the warning citation.  At the hearing, Trooper Vowell testified that the warning was for both the unsafe lane change and the failure to have a driver license, but that he failed to check off the unsafe lane change violation on the paperwork.  Even though the citation was merely a warning, Trooper Vowell noticed that Kalkhorani's nervousness had not subsided.  Total elapsed time from the initial traffic stop to the completion of the warning citation was approximately seventeen minutes, thirty seconds.

Upon finishing the warning citation, Trooper Vowell then advised Kalkhorani that he would run his drug dog "Hilto" around the car while the requests to dispatch were pending. Hilto alerted to the car.  Trooper Vowell returned to his patrol vehicle and received from dispatch the returns on the driver license and registration checks.  Trooper Vowell informed Kalkhorani that the drug dog smelled narcotics and that the car would be searched.  Trooper Vowell and other Oklahoma Highway Patrol officers searched the vehicle and found a marijuana pipe within the luggage located in the trunk.  Trooper Vowell also found a white sock containing twenty-nine allegedly fraudulent credit cards and three counterfeit driver licenses within the center console of the car.  On June 8, 2005, a federal Grand Jury indicted Kalkhorani and Booker under 18 U.S.C. § 1029(a)(3).

## DISCUSSION

### I.    Kalkhorani's Motion to Suppress.

Kalkhorani proffers three arguments for his contention that the evidence seized from the car should be suppressed: that Trooper Vowell did not have probable cause to instigate the traffic stop; that Trooper Vowell's questions exceeded the permissible scope of the traffic stop; and that Trooper Vowell exceeded the permissible duration of the traffic stop. Kalkhorani's arguments are unavailing.

It is well established that the protections of the Fourth Amendment "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  United States v. Williams, 403 F.3d 1203, 1206 (10th Cir. 2005).  Routine traffic stops are analyzed under the two-part test announced by the United States Supreme Court in Terry v. Ohio, 392 U.S.

1, 19-20 (1968).  Id.  First, the Court must determine whether the stop was "justified at its inception."  Id.  Second, the Court must determine whether the trooper's conduct during the traffic stop was reasonably related in scope and duration to the circumstances giving rise to the initial traffic stop.  Id.

> A.    Terry's First Prong – Justified at Inception.

Kalkhorani first argues that the signs along Interstate 44 leading to the toll booth require individuals paying the toll in cash to be in the right-hand lane.  Kalkhorani concludes that since he was in the right-hand lane, and as there was no other right-hand lane, he could not have changed lanes unsafely.

"[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995).  That the officer may have had some other subjective motivation for conducting the stop is irrelevant.  United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998).

In this case, Trooper Vowell testified that Kalkhorani failed to change lanes safely when he exited Interstate 44 from the right-hand lane and onto the lanes leading to the toll booths and failed to use his turn signal.  The Court finds that Kalkhorani's failure to signal when exiting Interstate 44 to pay the toll is sufficient under the Fourth Amendment to justify Trooper Vowell's initial traffic stop.  See 47 OKLA. STAT. 11-309.

> B.    Terry's Second Prong – Reasonable Scope and Duration.

A traffic stop must be of limited scope; the officer generally must not inquire into matters unrelated to the traffic stop.  United States v. Walker, 933 F.2d 812, 816 (10th Cir. 1991).  A traffic stop must also be of limited duration, "last[ing] no longer than is necessary to effectuate the purpose of the stop."  Florida v. Royer, 460 U.S. 491, 500 (1983).  Trooper Vowell may, without unlawfully expanding the traffic stop's scope or duration, request the driver's license, vehicle insurance and registration; inquire about the driver's authority to operate the vehicle; inquire about the vehicle's ownership; inquire about the travel history and travel plans of the persons detained; ask about the presence of loaded firearms in the vehicle; examine any documents produced; run a computer check on the vehicle's registration; run a computer check on persons detained for any criminal history; and issue a citation or warning.  United States v. Holt, 264 F.3d 1215, 1220-26 (10th Cir. 2001); United States v. Zubia-Melendez, 263 F.3d 1155, 1161 (10th Cir. 2001); United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997); United States v. Shareef, 100 F.3d 1491, 1501 (10th Cir. 1996); United States v. Alvarez, 68 F.3d 1242, 1245 (10th Cir. 1995).  However, a traffic stop may be extended beyond that which is necessary to effectuate the purpose of the stop if the trooper has an objectively reasonable and articulable suspicion that illegal activity is afoot.  Holt, 264 F.3d at 1221.

The United States Supreme Court has refused to put a bright-line time limit on what constitutes an acceptable duration of a traffic stop.  United States v. Sharpe, 470 U.S. 675, 685 (1985) (refusing to establish a per se twenty-minute maximum detention period).  What constitutes a reasonable amount of time varies on a case-by-case basis with the Court

applying "common sense and ordinary human experience" when making the determination. Id. A trooper must work with diligence and without unnecessary dely, but is not required to take the absolute shortest amount of time as can be conceived in hindsight. See id. at 686-87.

Here, the initial traffic stop lasted approximately seventeen minutes, thirty seconds, during which time Trooper Vowell performed multiple tasks in addition to filling out the warning ticket:  He initially questioned Kalkhorani about their travel history, travel plans, driver license, vehicle insurance, and vehicle ownership; he made a second trip to the car in order to retrieve insurance documents; he questioned Booker about their travel history, travel plans, and vehicle ownership; he briefly questioned Thompson; and he requested multiple checks from dispatch and awaited the returns.  The Court finds that the questions Trooper Vowell asked Defendants were reasonably related in scope to the circumstances surrounding the initial traffic stop and did not exceed the scope of the investigative detention. Furthermore, the Court finds that Trooper Vowell acted diligently and did not unreasonably detain Kalkhorani beyond the length of time necessary to write a warning.

In the alternative, the Court also finds that Trooper Vowell, during the seventeen minute, thirty second traffic stop, developed reasonable suspicion that criminal activity was afoot.  When determining the existence of reasonable suspicion, the Court must look to the totality of the circumstances through the lenses of common sense and ordinary human experience.  Wood, 106 F.3d at 946.  The Court may not employ a "divide-and-conquer" approach whereby each factor is individually isolated and evaluated.  Williams, 403 F.3d at 1207.  The Court must give deference to a trooper's experience and ability to distinguish

-7-

between innocent and suspicious actions; however, a trooper's hunch or inchoate suspicion is insufficient to create reasonable suspicion. Wood, 106 F.3d at 946. The likelihood of criminal activity need not rise to the level of probable cause, and it falls shorter than a preponderance of the evidence standard. United States v. Arvizu, 534 U.S. 266, 273-74 (2002).

Here, Kalkhorani exhibited signs of nervousness in that he would not make eye contact, his bottom lip and hands were shaking, and he was rubbing his hands on his pants. Kalkhorani's nervousness never subsided, even after Trooper Vowell informed him that he would only receive a warning. Kalkhorani failed to produce a driver license. Kalkhorani also initially told Trooper Vowell that Booker owned the car, but later could not tell Trooper Vowell who actually owned the car. Defendants' accounts of their travel history were also in conflict: Kalkhorani stated they were coming from St. Louis, Missouri, had been gone for two days, and had been looking at property, while Booker stated they were coming from Indiana and Tennessee, had been gone for one week, and had been sightseeing. Under the totality of the circumstances and giving due deference to Trooper Vowell's professional abilities, the Court finds that Trooper Vowell did have an objectively reasonable and articulable suspicion that illegal activity was afoot sufficient to extend the traffic stop and complete further investigation.

## II.     Booker's Motion to Suppress.

Booker also proffers three arguments why the evidence seized from the car should be suppressed: that the warning ticket was only for the lack of a driver license and not for the

alleged lane change violation; that the traffic stop impermissibly exceeded the scope of its initial justification; and that nervousness alone does not support a finding of reasonable suspicion. Booker's arguments are also unavailing.

Booker's first argument fails as the Court finds Trooper Vowell's testimony outlined above to be credible. Moreover, Booker has failed to cite, and the Court's research has failed to uncover, precedent requiring a trooper to give either a warning or a citation for each traffic violation discovered during the course of a traffic stop. Booker's second argument fails for the reasons discussed above. Lastly, Booker's third argument fails as more than mere nervousness, as discussed above, gave Trooper Vowell an objectively reasonable and articulable suspicion that criminal activity was afoot.

## CONCLUSION

Upon review of the evidence and the law, the Court finds that the May 3, 2005, traffic stop of Defendants was justified at its inception and that Trooper Vowell's conduct during the traffic stop was reasonably related in scope and duration to the circumstances giving rise to the traffic stop. In the alternative, the Court also finds that Trooper Vowell had an objectively reasonable and articulable suspicion sufficient to detain Defendants for further investigation. Accordingly, Kalkhorani's Motion to Suppress (Dkt. No. 41) and Booker's Motion to Suppress (Dkt. No. 39) are **DENIED** for reasons delineated more fully herein.

IT IS SO ORDERED this 24th day of August, 2005.

ROBIN J. CAUTHRON
United States District Judge